No. 23-4179

In The

# United States Court of Appeals for the Fourth Circuit

United States of America

*Appellee*

v.

Darryl Colton Frazer

*Appellant*

On Appeal from the United States
District Court for the District of
Maryland,
No. 8:19-cr-00545-DLB-1

## Brief for Appellant

Steven M. Klepper
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, MD 21202
(410) 752-6030
sklepper@kg-law.com

*Appointed Counsel for Appellant*

# Table of Contents*

Table of Contents ...................................................................... ii

Table of Authorities.................................................................. iii

Jurisdictional Statement............................................................ 1

Issues Presented for Review ...................................................... 1

Statement of the Case ................................................................ 1

Summary of Argument............................................................... 6

Standard of Review ................................................................... 7

Argument................................................................................... 8

    I.    The officers lacked reasonable suspicion to search Mr. Frazer's bag............................................................... 8

    II.    The officers lacked reasonable suspicion to stop Mr. Frazer................................................................... 10

        A. The subjective "good faith" belief Mr. Frazer was jaywalking was not objective reasonable suspicion. ............ 11

        B. Mr. Frazer's flight did not supply reasonable suspicion that he was engaged in criminal activity. ............................ 15

    III.    The district court did not recognize or exercise its discretion whether to define reasonable doubt. ........................ 19

    IV.    This Court should abandon its "disfavor" for defining reasonable doubt.................................................................... 22

Conclusion ............................................................................... 26

Statement Respecting Oral Argument ..................................... 27

Certificate of Compliance........................................................ 28

Certificate of Service .......................................... unnumbered

---

    * Because Appellant is not a corporate party, Local Rule 26.1(a)(1)(B) does not require a disclosure statement.

4865-6355-0577, v. 4

# Table of Authorities

## **Cases**

*Britt v. DeJoy*, 45 F.4th 790 (4th Cir. 2022) ...........................................26

*Feminist Majority Found. v. Hurley*, 911 F.3d 674 (4th Cir. 2018)..................................................................................................13

*Illinois v. Wardlow*, 528 U.S. 119 (2000) .............................................16

*In re Winship*, 397 U.S. 358 (1970) ...............................................23, 24

*James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993) .....................................20

*Kansas v. Glover*, 140 S. Ct. 1183 (2020) .............................................19

*Ornelas v. United States*, 517 U.S. 690 (1996).......................................7

*Terry v. Ohio*, 392 U.S. 1 (1968).................................................8, 9, 11

*United States v. Bowman*, 884 F.3d 200 (4th Cir. 2018) .......................14

*United States v. Brown*, 925 F.3d 1150 (9th Cir. 2019)........................19

*United States v. Burton*, 228 F.3d 524 (4th Cir. 2000) .........................11

*United States v. Buster*, 26 F.4th 627 (4th Cir. 2022) ...................8, 9, 10

*United States v. Foster*, 634 F.3d 243, (4th Cir. 2011) ............................8

*United States v. Foster*, 824 F.3d 84 (4th Cir. 2016) ..............................9

*United States v. Green*, 599 F.3d 360 (4th Cir. 2010).............................7

*United States v. Hassan El*, 5 F.3d 726 (4th Cir. 1993) ........................11

*United States v. Hernandez-Mendez*, 626 F.3d 203 (4th Cir. 2010)................................................................................................7

*United States v. Hornsby*, 666 F.3d 296 (4th Cir. 2012)........................25

*United States v. Lightly*, 616 F.3d 321 (4th Cir. 2010)............................7

*United States v. Mayo*, 361 F.3d 802 (4th Cir. 2004)............................11

*United States v. Miller*, 54 F.4th 219 (4th Cir. 2022)............................14

*United States v. Powell*, 666 F.3d 180 (4th Cir. 2011)............................8

*United States v. Simmons*, 11 F.4th 239 (4th Cir. 2021).................22, 25

*United States v. Smith*, No. 21-4328, 2023 WL 1433639 (4th Cir. Feb. 1, 2023).................................................................................20

*United States v. Watson*, 207 F.3d 694 (4th Cir. 2000) .......................... 20

*Victor v. Nebraska*, 511 U.S. 1 (1994) .................................................... 20

## Statutes

18 U.S.C. § 3231 ....................................................................................... 1

28 U.S.C. § 1291 ....................................................................................... 1

MD. CODE ANN., TRANSP. § 21-506(a) ..................................................... 11

## Other Authorities

Amanda Geller et al., *Aggressive Policing and the Mental
    Health of Young Urban Men*, 104 AM. J. PUB. HEALTH
    2321 (2014) ......................................................................................... 18

Committee on Model Criminal Jury Instructions Third
    Circuit, Model Criminal Jury Instructions, 3.06 (Feb.
    2021) .................................................................................................... 24

Committee on Pattern Jury Instructions District Judges
    Association Fifth Circuit, Pattern Jury Instructions
    (Criminal Cases), 1.05 (2019) ........................................................... 24

Criminal Pattern Jury Instruction Committee of the United
    States Court of Appeals for the Tenth Circuit, Criminal
    Pattern Jury Instructions, 1.05 (2021) ............................................. 25

Dan Morse, *Man Dies Two Days After Being Tasered by
    Montgomery County Police Officer*, WASH. POST, May 15,
    2015 ..................................................................................................... 16

Doug Donovan, *Taser Death Complaint Settled*, BALT. SUN,
    Aug. 10, 2017. ............................................................................... 15, 16

Frank Edwards, Hedwig Lee, & Michael Esposito, *Risk of
    being killed by police use of force in the United States by
    age, race-ethnicity, and sex*, PNAS, Aug. 20, 2019. ........................ 18

Jacob Bor et al., *Police Killings and Their Spillover Effects
    on the Mental Health of Black Americans: A Population-
    Based, Quasi-Experimental Study*, 392 LANCET 302
    (2018) ................................................................................................... 19

iv

Judicial Committee on Model Jury Instructions for the
Eighth Circuit, Manual of Model Criminal Jury
Instructions for the District Courts of the Eighth Circuit
3.11 (2022)..................................................................................24

Judicial Council of the United States Eleventh Judicial
Circuit, Eleventh Circuit Pattern Jury Instructions,
Criminal Cases, B3 (Mar. 10, 2022) ....................................25

Kristin Henning, *The Reasonable Black Child: Race,
Adolescence, and the Fourth Amendment*, 67 AM. U.L.
REV. 1513, 1556 (2018) ........................................................17

Ninth Circuit Jury Instructions Committee, Model Criminal
Jury Instructions for the District Court of the Ninth
Circuit, 6.5 (2023) ................................................................24

Opening Br. of Appellant, *United States v. Brooks*, No. 21-
4569, 2023 WL 20874 (4th Cir. Jan. 3, 2023)....................26

*Race in America 2019*, Pew Research Center (April 3, 2019),
https://www.pewresearch.org/social-
trends/2019/04/09/race-in-america-2019/psdt_04-09-
19_race-00-03/ ......................................................................17

Rory Kramer & Brianna Remster, *Stop, Frisk, and Assault?
Racial Disparities in Police Use of Force During
Investigatory Stops¸* 52 L. & SOC'Y REV. 960 (2018)............18

Sixth Circuit Pattern Criminal Jury Instruction Committee,
Pattern Criminal Jury Instructions (Mar. 1, 2023) ...........24

## Jurisdictional Statement

The district court exercised subject-matter jurisdiction over this criminal case under 18 U.S.C. § 3231 against Appellant Darryl Colton Frazer. JA13. It entered the judgment of conviction on March 13, 2023. JA32. Mr. Frazer noted an appeal that same day. JA39. Therefore, this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## Issues Presented for Review

1.  Was the search of Appellant's bag constitutionally reasonable when Appellant's out-of-reach bag presented no credible threat to the officers' safety at the time of the search?

2.  Was law enforcement's "good faith" belief that Appellant was jaywalking in a parking lot sufficient to establish reasonable suspicion for a *Terry* stop?

3.  Did the district court have discretion to give the jury a definition of reasonable doubt?

4.  Should this Court, as the district court requested, end its disfavor for instructions defining reasonable doubt?

## Statement of the Case

On July 11, 2019, there was a shooting in the area of Lockwood Drive in the White Oak neighborhood of Silver Spring, Maryland. JA48.

The next day, Montgomery County Police Officer Christopher Brown was circling the area for potential victims or suspects. JA49. Other officers told him that a suspected "lookout" they saw at the crime scene was a Black male with dreadlocks. JA49. While patrolling, Officer Brown observed Mr. Frazer and Shamire Moore walking on Lockwood Drive, about a mile from the shooting. JA50, JA53. Both were carrying black satchels. JA50. Mr. Moore, who is a Black man with dreadlocks, had a white ace bandage around his arm. JA50-51. Officer Brown observed the men walking around the White Oak Shopping Center. JA55-56. He was then called away, and when he returned neither man was carrying a satchel. JA56.

Two weeks later, on July 25, 2019 at around 7:00 p.m., Officer Brown observed Mr. Frazer and Mr. Moore walking down the center of July Drive towards Lockwood Drive. JA59. July Drive runs from Lockwood Drive to the back of an apartment complex, where it ends in a cul-de-sac. JA104, JA283. It has no intersections. JA105, JA283. There are parking spaces for the residents of the apartment complex on both sides of the entire length of July Drive. JA104-105, JA284. Both Mr. Frazer and Mr. Moore were carrying black satchels. JA69.

Officer Brown watched Mr. Frazer and Mr. Moore cross Lockwood Drive and enter Heather Hollow Circle, where they remained for about ten minutes. JA68. When Mr. Frazer and Mr. Moore returned to Lockwood Drive, Officer Brown decided to ask them about the July 11 shooting. JA121. As a pretext, he radioed his team to stop Mr. Frazer and Mr. Moore for a pedestrian violation—walking down the center of July Drive. JA70. Officer Brown, who was in plainclothes, continued to surveille Mr. Frazer and Mr. Moore while Officer Jacobs and Corporal Halko, who were in uniform, conducted the stop. JA70-71. Officers Jacobs and Halko drove up to Mr. Frazer and Mr. Moore as they were walking into the Lockwood apartment complex. JA131.

Upon seeing the officers, Mr. Frazer and Mr. Moore began to walk away through the breezeway of one of the apartment buildings. JA134. Jacobs and Halko followed them. JA135. After following them through the breezeway, Officer Jacobs saw Mr. Frazer and Mr. Moore running through a parking lot towards another apartment building. JA139. When Officer Jacobs reached the apartment building, he saw Mr. Frazer and Mr. Moore trying to enter an apartment on the second floor. JA140. As Officer Jacobs climbed the stairs to the second floor landing, yelling

3

"stop," Mr. Moore and Mr. Frazer started to lower themselves down from the outdoor railing of the stairway back to the ground. JA287 (video 3:31). Mr. Moore dropped to the ground and ran away. JA287 (video 3:36-3:37).

Officer Jacobs then went back down the stairs, yelling repeatedly at Mr. Frazer, who was still hanging from the railing, to "get down here; I'm gonna tase you!" JA287 (video 3:37-3:45). Mr. Frazer pulled himself back over the railing and started to come down the stairs towards Officer Jacobs, who was pointing a taser at him. JA287 (video 3:45-3:49). Mr. Frazer retreated a few steps, but then began to descend again in response to Officer Jacobs' order to "get down here." JA287 (video 3:50-3:53). Then Officer Jacobs said he would tase Mr. Frazer if he didn't get on the ground. JA287 (video 3:53). Hearing this, Mr. Frazer began to go back up the stairs. JA287 (video 3:55). Officer Jacobs then told Mr. Frazer to drop his bag. JA287 (video 3:56). Mr. Frazer dropped the bag off the second story landing and laid face-down on the floor. JA287 (video 3:58). Officer Jacobs then handcuffed Mr. Frazer. JA287 (video 4:04). Officer Brown

4

retrieved the bag from the ground outside of the apartment building and searched it, finding a gun and 100 grams of marijuana.[1] JA90, JA182.

Mr. Frazer went to trial on a second superseding indictment charging him with (1) conspiracy to distribute marijuana, heroin, MDMA, oxycodone, and cocaine under 21 U.S.C. § 846;[2] (2) possession of marijuana with intent to distribute under 21 U.S.C. § 841(a)(1); (3) possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c); and (4) being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). JA13-16.

Following the district court's denial of his motion to suppress evidence, JA12, Mr. Frazer stipulated at trial that he possessed marijuana and that the Government had satisfied all elements of Count Four. JA280. The jury convicted Mr. Frazer on Count One only as to

---

[1] As of July 2023, the purchase and possession of cannabis for personal adult-use is legal in Maryland for adults over the age of 21. Cannabis remains illegal under federal law. 21 U.S.C. § 812.

[2] After resting its case, the Government conceded that it had not presented sufficient evidence on the MDMA and heroin allegations. JA260, JA269. The district court granted Mr. Frazer's Rule 29 motion for acquittal as to the MDMA and heroin listed in Count 1. JA269.

5

marijuana; Count Two; and Count Four. JA30-31. The jury found Mr. Frazer not guilty on Count Three. JA31.

## Summary of Argument

The district court erred when it concluded that law enforcement had justification to search Mr. Frazer's bag. The bag was on the ground outside of an apartment building, while Mr. Frazer was face-down on the landing of the second story of said building with his hands handcuffed behind his back. Under those circumstances, there was no credible threat to the officers' safety justifying the search of Mr. Frazer's bag.

Moreover, officers lacked reasonable suspicion to stop Mr. Frazer in the first place. Mr. Frazer's behavior while walking with Mr. Moore was not objectively suspicious. Officer Brown's proffered pretext of a jaywalking violation is unsatisfactory, as Mr. Frazer and Mr. Moore were walking in what was effectively a parking lot. Further, Mr. Frazer's flight from Officers Jacobs and Halko, given the many high-profile episodes of violent police encounters with Black men, was not indicative of criminal activity. Both errors were prejudicial because the jury convicted Mr. Frazer solely on what was in his bag.

6

The district court also misapprehended Fourth Circuit law on providing jury instructions on reasonable doubt. Mr. Frazer requested such an instruction, and Judge Grimm wished to provide it, but did not do so because he was under the impression that Fourth Circuit caselaw prohibited him from providing the instruction. This error was prejudicial.

## Standard of Review

When reviewing a motion to suppress, this Court reviews questions of law *de novo* and questions of fact for clear error. *United States v. Green*, 599 F.3d 360, 375 (4th Cir. 2010). Determinations of reasonable suspicion are reviewed *de novo* on appeal. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Because the district court denied Mr. Frazer's motion to suppress, this Court views the "evidence in the light most favorable to the Government." *United States v. Hernandez-Mendez*, 626 F.3d 203, 206 (4th Cir. 2010).

This Court reviews a district court's refusal to provide a requested jury instruction for an abuse of discretion. *United States v. Lightly*, 616 F.3d 321, 366 (4th Cir. 2010).

## Argument

### I. The officers lacked reasonable suspicion to search Mr. Frazer's bag.

Reversal is necessary under *United States v. Buster*, 26 F.4th 627 (4th Cir. 2022), which this Court decided after the district court denied Mr. Frazer's motion to suppress. The police lacked a reasonable articulable suspicion to search Mr. Frazer's bag when he was handcuffed and face down, unable to reach it.

A police officer can briefly detain an individual for investigative purposes if the officer has reasonable suspicion the individual is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). An officer has reasonable suspicion to seize an individual only when able to "articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011) (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). "Simple 'good faith on the part of the arresting officer is not enough.'" *Terry*, 392 U.S. at 22.

"Even if an investigatory stop is justified by reasonable suspicion, a subsequent frisk of a suspect for weapons is not necessarily

8

permissible." *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016). An officer must have a justified belief that "the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others." *Terry*, 392 U.S. at 24. Such a search for weapons must be "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Id.* at 25-26.

But an officer lacks the reasonable suspicion required to search an individual when that individual poses no threat to officer safety. *Buster*, 26 F.4th at 635. In *Buster*, officers had handcuffed the defendant, who was lying face-down on the ground. *Id.* at 630. They then cut his bag off of his body and searched it. *Id.* The district court denied the defendant's motion to suppress, concluding that the search of his bag was reasonable because "the officers had reason to believe they were dealing with an armed and dangerous person." *Id.* at 631. This Court reversed, holding that a "doctrine authorizing a limited warrantless search to protect officer safety cannot be stretched to cover situations where there is no realistic danger to officer safety." *Id.* at 635. When the individual being seized has been separated from their bag and no longer has access to it,

9

even the likelihood of finding a weapon in the bag "has no bearing on the justification for a protective frisk." *Id.*

Under *Buster*, the district court erred in finding that Officer Jacobs executed "the type of search allowed in an investigative stop under *Terry*." JA241. Officer Jacobs did not have reasonable suspicion sufficient to justify searching Mr. Frazer's bag. When Officer Jacobs opened Mr. Frazer's bag, Mr. Frazer was handcuffed face-down on the second-story landing of an apartment building. The bag was on the ground outside of the apartment building. Other than stating that he had found weapons in bags in the past, Officer Jacobs never articulated how the contents of the bag presented a threat to his or others' safety while so far out of Frazer's reach. JA52. The Court should order reversal on this ground alone.

## II.    The officers lacked reasonable suspicion to stop Mr. Frazer.

Even if *Buster* were not dispositive, the officers also lacked reasonable suspicion to perform an investigatory stop of Mr. Frazer. "An officer may not conduct [a] protective search for purposes of safety *until he has a reasonable suspicion that supports the investigatory stop*."

*United States v. Mayo*, 361 F.3d 802, 806 (4th Cir. 2004) (quoting *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000)) (Court's emphasis).

### A. The subjective "good faith" belief Mr. Frazer was jaywalking was not objective reasonable suspicion.

The district court found the officers had reasonable suspicion to stop Mr. Frazer in large part because of their "good faith belief" that Mr. Frazer was jaywalking. JA216-217; JA226-227; *see* MD. CODE ANN., TRANSP. § 21-506(a) ("Where a sidewalk is provided, a pedestrian may not walk along and on an adjacent roadway.").

But a police officer's "good faith belief" does not give rise to reasonable suspicion. *Terry*, 392 U.S. at 22. Rather, to show reasonable suspicion, an officer must point to specific and articulable facts that a violation occurred. *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993). It is a "purely objective standard" that does not look to the officer's subjective state of mind. *Hassan El*, 5 F.3d at 730-731.

The lack of such objective facts is manifest. The district court saw "[n]one of the facts that would be necessary for me to conclude that there was, in fact, a violation of 21-506(a). I suspect there was not." JA216. The photos and testimony repeatedly reinforced that July Drive is an apartment parking lot. JA62-65, JA87, JA104. Officer Brown conceded

11

that "there's no thru traffic," that "the entire length on the right and the left are parking spots for the various apartment complex that it is up against," and that except for delivery vehicles a driver is "going to drive up July for the sole purpose of parking in one of those spots." JA105.

July Drive is a few hundred feet long, ends in a cul-de-sac with no outlet, and serves only the adjacent apartment buildings. JA283. The aerial photos show that it is a parking lot, not a roadway.



The Government's images came from Google Maps. For further assurance that July Drive was objectively not a roadway, the Court may take judicial notice of other images from Google Maps. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 711 n.5 (4th Cir. 2018) (Agee, J., concurring).

Here is the street view of the intersection of Lockwood Drive and July Drive:



The small sign on the left states: "Private Parking: No Trespassing."



Let's call the jaywalking citation what it is—a stop for walking while Black. The parties and the district court agree the stop was subjectively "just a pretext to get close to Moore and Frazer for purposes of questioning them about the 7/11 shooting." JA227. No one contends there was reasonable suspicion that Mr. Frazer was involved in the July 11 shooting. He was a Black man, carrying a satchel a mile away from the shooting, two weeks after the shooting. Mr. Moore, not Mr. Frazer, was a "Black man with dreadlocks," who matched the non-specific description of a person of interest at the scene. Regardless of whether the police held an objectively reasonable suspicion that Mr. Moore was involved in the shooting, there are no "specific and articulable facts" to demonstrate reasonable suspicion as to Mr. Frazer. *United States v. Miller*, 54 F.4th 219, 228 (4th Cir. 2022) (quoting *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018)).

With no objectively reasonable suspicion that Mr. Frazer was involved in the shooting, and with no objectively reasonable suspicion he was jaywalking, the record leaves only the officers' unreasonable subjective belief that they could make a pretextual stop for jaywalking. The district court's ruling cannot stand.

14

**B. Mr. Frazer's flight did not supply reasonable suspicion that he was engaged in criminal activity.**

The other main fact the district court cited was Mr. Frazer's flight from the police, with particular focus on the measures he took to evade them as they repeatedly screamed they would "tase" him.

When a Black man runs from Montgomery County officers threatening to use their tasers, he is fleeing a threat of deadly force. The *Baltimore Sun* reported in 2017 that "Montgomery County recorded four deaths of people shocked with Tasers by county officers since 2009, the most in the state." Doug Donovan, *Taser Death Complaint Settled*, BALT. SUN, Aug. 10, 2017. One such victim was Anthony Howard, Sr.: "After he dropped [a child's] scooter and keeled over onto a flower bed, police continued to pump electricity into Howard; he kicked wildly with four officers standing over him." *Id.* "Police fired their Tasers at Howard nine times for a total of 37 seconds, data shows—far above the recommended limit of 15 seconds. He stopped breathing and died shortly afterward." *Id.*; *see also* Dan Morse, *Man Dies Two Days After Being Tasered by Montgomery County Police Officer*, WASH. POST, May 15, 2015 (reporting on death of Dajuan Graham). As the case of Anthony Howard shows,

submission to the officers' demands was no guarantee they would not tase him anyway.

The district court found that Mr. Frazer's flight from officers helped to support reasonable suspicion under *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). *Wardlow* held that an individual's flight from law enforcement in a high-crime area may contribute to an officer's reasonable suspicion. *Id.* at 124. The officers never identified this area of Silver Spring as a high-crime area, however, and the district court made no such finding. It was over a mile from the shooting.

In any event, reasonable suspicion analysis is based on "commonsense judgments and inferences about human behavior," *Wardlow*, 528 U.S. at 125. Since *Wardlow* was decided, not only have commonsense judgments about a Black man's flight from police changed, but empirical studies corroborating these commonsense judgments are now available.

Over the past 20 years, the American public has witnessed countless incidents of Black people experiencing violence at the hands of law enforcement. The relationship between communities of color and police, already characterized by distrust and fear, has further

16

deteriorated in response to these widely-publicized tragedies. *See* Kristin Henning, *The Reasonable Black Child: Race, Adolescence, and the Fourth Amendment*, 67 AM. U.L. REV. 1513, 1556 (2018). It would be difficult to find an American today who has not heard at least one of the following names: Breonna Taylor, George Floyd, Freddie Gray, Philando Castile, Eric Garner. These highly publicized deaths have contributed to a common understanding that young Black men often run from police out of fear of injury or death.[3]

Furthermore, empirical research unavailable at the time *Wardlow* was decided validates these commonsense inferences. Interacting with law enforcement is more dangerous for Black men than for others.[4] Young

---

[3] In a 2019 Pew Center survey, 84% of Black adults and 63% of white adults said that Black individuals are generally treated less fairly than white individuals when dealing with police. *Race in America 2019*, Pew Research Center (April 3, 2019), https://www.pewresearch.org/social-trends/2019/04/09/race-in-america-2019/psdt_04-09-19_race-00-03/.

[4] Black men are 2.5 times more likely to be killed by police than are white men. Frank Edwards, Hedwig Lee, & Michael Esposito, *Risk of being killed by police use of force in the United States by age, race-ethnicity, and sex*, PNAS, Aug. 20, 2019, at 16794. A 2018 study found that Black individuals are more likely to be stopped by police, more likely to be subjected to force during that stop, and more likely to be seen as threatening by officers, leading to a higher rate of police drawing their weapons. Rory Kramer & Brianna Remster, *Stop, Frisk, and Assault?*

17

men who experience police contact, especially intrusive contact, report higher levels of anxiety and trauma associated with police contact. Amanda Geller et al., *Aggressive Policing and the Mental Health of Young Urban Men*, 104 AM. J. PUB. HEALTH 2321, 2323-24 (2014). The study also found a significant connection between stop-and-frisk intrusions and post-traumatic stress disorder.[5] *Id.* A 2018 study found that Black people reported adverse mental health effects for up to three months after being exposed to news about police shootings. Jacob Bor et al., *Police Killings and Their Spillover Effects on the Mental Health of Black Americans: A Population-Based, Quasi-Experimental Study*, 392 LANCET 302 (2018).

This Court has an opportunity to update its caselaw to better reflect today's "commonsense judgments and inferences" as well as the available

---

*Racial Disparities in Police Use of Force During Investigatory Stops¸* 52 L. & SOC'Y REV. 960, 987 (2018).

[5] If the Court watches until the end of the video of Mr. Frazer's arrest, it will see how these stops strip Black Americans of their fundamental dignity. Even after Mr. Frazer submitted, Officer Jacobs gratuitously humiliated him. Jacobs removed Mr. Frazer's shoes and socks (6:50 to 7:15) as part of the protective search. At minute 8:00, Mr. Frazer asked if he could put his shoes and socks back on. When Jacobs said "no," and Mr. Frazer asked why, the response was: "Because I said not to." Mr. Frazer then stands on the dirty asphalt for the remainder of the video.

18

empirical evidence about flight from police.[6] Other circuits have already

begun to do so, giving less weight to unprovoked flight as a factor in the

reasonable suspicion analysis. *See United States v. Brown*, 925 F.3d 1150,

1157 (9th Cir. 2019) ("Given that racial dynamics in our society—along

with a simple desire not to interact with police—offer an 'innocent'

explanation of flight, when every other fact posited by the government

weighs so weakly in support of reasonable suspicion, we are particularly

hesitant to allow flight to carry the day in authorizing a stop."). The Court

should hold that the officers lacked reasonable suspicion to stop Mr.

Frazer.

## III.    The district court did not recognize or exercise its discretion whether to define reasonable doubt.

Mr. Frazer requested a jury instruction defining reasonable doubt.

Although "the Constitution neither prohibits trial courts from defining

reasonable doubt nor requires them to do so," *Victor v. Nebraska*, 511

U.S. 1, 5 (1994), this Court has long discouraged courts from providing

---

[6] In *Kansas v. Glover*, the Supreme Court relied on both commonsense experience and empirical studies in a reasonable suspicion analysis. 140 S. Ct. 1183 (2020).

such a definition. *United States v. Watson*, 207 F.3d 694, 699 (4th Cir. 2000) (opinion appended to per curiam order affirming by equal division).

In an unreported opinion issued after trial in this case, this Court recognized that Judge Bennett "may have thought our circuit banned instructions on reasonable doubt." *United States v. Smith*, No. 21-4328, 2023 WL 1433639, at *1 n.2 (4th Cir. Feb. 1, 2023). Although the appellant did not argue that the district court abused its discretion, the Court took the "opportunity to emphasize that our rule doesn't forbid such instructions." *Id.* The Court observed that in an appropriate case, an appellant could argue that the district judge failed to exercise discretion, which is itself an abuse of discretion. *Id.* (citing *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993)).

Judge Grimm made clear that, but for the same perceived limitation on his discretion, he would have granted Mr. Frazer's request to define reasonable doubt for the jury:

> It has always sort of bothered me that we say that there is this standard which is so enhanced and so important, but we give almost no guidance other than just a definition itself to the jury itself about what it is. That's just bothered me because our job is to explain the law to the jury, and the law of the Fourth Circuit is almost like this is so bad that if you try to even explain it, you will mess it up, so just don't explain it, which seems very unsatisfying to me. **But that's the law,**

20

**and that's the law I have always adhered to in my entire time with this Court.**

JA276 (emphasis added).

Rather than exercise discretion, Judge Grimm delegated the decision to the Government: "if both sides agree to give the instruction, then I will give it because, otherwise, if there were an appeal, it would be invited error." JA276. Without criticizing the proposed instruction, the Government reinforced the perceived limitation: "I philosophically align with you on that, but I am not going to cause the breach in the wall for my office, and our office policy is to hold you on that." JA277.

Judge Grimm therefore declined to give the instruction, while expressing his hope that the Court would reverse him:

> Maybe this will be the case where the Fourth Circuit -- what was that from Macbeth, Screw your courage to the sticking point, ma'am—maybe that's where the Fourth Circuit will screw its courage to the sticking point, and say, Grimm was wrong; he should have done it; **he had the perfect example there**; he was right to leave when he did; he should have left earlier. I am not going to do it. It's in the record. **My heart is with you guys, but my head is with the law in the Fourth Circuit.**

JA277 (emphasis added).

It is a rare thing for a judge to request reversal, and the Court should do so. The Court will reverse when the proposed instruction:

"(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case." *United States v. Simmons*, 11 F.4th 239, 264 (4th Cir. 2021). First, no one disputes the Maryland pattern definition is a correct statement of the law. JA275-276. Second, Judge Grimm spoke from considerable experience in finding that the standard is "so enhanced and so important, but we give almost no guidance," and that such guidance would "be appreciated by the jury." JA276-277. Third, the presumption of innocence is the most important concept in criminal law, and Judge Grimm called this case "the perfect example" of when a definition would help the jury. JA277.

Judge Grimm told this Court he was not exercising discretion, and that he would be happy to be reversed. The Court should do so.

## IV.  This Court should abandon its "disfavor" for defining reasonable doubt.

We invite the Court to go further and issue a reported opinion that gives trial judges true discretion by stating that a definition of reasonable doubt is neither favored nor disfavored. As with any other instruction, the trial judge, being most familiar with the nuances of the case and what

22

is helpful to a jury, is best-positioned to decide whether to define reasonable doubt.

"The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt." *In re Winship*, 397 U.S. 358, 363-64 (1970). The reasonable doubt standard is "a prime instrument for reducing the risk of convictions resting on factual error." *Id.* at 363. As such, it is of the utmost importance that juries understand the meaning of this standard before they reach a verdict. Leaving jurors to their own individual conceptions of the meaning of "beyond a reasonable doubt" risks unconstitutional convictions.

In recognition of the importance of this standard, many state and federal trial courts provide juries with a definition of reasonable doubt.

Maryland state courts provide a definition,[7] and the Third, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits provide a definition in their model jury instructions.[8] This Court, however, discourages judges from defining reasonable doubt for juries on the basis of its belief "that attempting to explain the words beyond a reasonable doubt is more dangerous than leaving a jury to wrestle with only the words

---

[7] Mr. Frazer adapted his proposed definition from one used in Maryland state trial courts. "A reasonable doubt is a doubt founded upon reason. Proof beyond a reasonable doubt requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs." JA28.

[8] Committee on Model Criminal Jury Instructions Third Circuit, Model Criminal Jury Instructions, 3.06 (Feb. 2021); Committee on Pattern Jury Instructions District Judges Association Fifth Circuit, Pattern Jury Instructions (Criminal Cases), 1.05 (2019); Sixth Circuit Pattern Criminal Jury Instruction Committee, Pattern Criminal Jury Instructions (Mar. 1, 2023); Judicial Committee on Model Jury Instructions for the Eighth Circuit, Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit 3.11 (2022); Ninth Circuit Jury Instructions Committee, Model Criminal Jury Instructions for the District Court of the Ninth Circuit, 6.5 (2023); Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, Criminal Pattern Jury Instructions, 1.05 (2021); Judicial Council of the United States Eleventh Judicial Circuit, Eleventh Circuit Pattern Jury Instructions, Criminal Cases, B3 (Mar. 10, 2022).

24

themselves." *United States v. Hornsby*, 666 F.3d 296, 310-311 (4th Cir. 2012).

This disfavor not only makes this Court an outlier, it also ignores the wisdom and experience of district court judges, who are most familiar with juries and what would help them. This Court has stressed time and again that it trusts trial judges to exercise broad discretion to decide what instructions will help a jury in a given case. *Simmons*, 11 F.4th at 264.

Judge Grimm supports the provision of a reasonable doubt definition.

> There is this standard which is so enhanced and so important, but we give almost no guidance …. [O]ur job is to explain the law to the jury, and the law of the Fourth Circuit is almost like this is so bad that if you try to even explain it, you will mess it up, so just don't explain it, which seems very unsatisfying to me …. And it's always, you know, struck me as somewhat judicial cowardice, frankly …. But I really think … if we were doing for the jury what we sort of aspire to do, an instruction … would be appreciated by the jury. I know I would appreciate it if I were the jury. And that instruction seems pretty reasonable.

JA276. Similarly, Chief Judge Bredar thinks "it would be better if our practice was to attempt to define reasonable doubt for jurors." Opening Br. of Appellant at 32, *United States v. Brooks*, No. 21-4569, 2022 WL 596116 (4th Cir. filed Feb. 22, 2023).

25

This Court should reevaluate its precedent discouraging judges from defining reasonable doubt, in recognition of trial judges' collective wisdom. If the Court concludes that en banc review is necessary to clarify the law, a limited en banc proceeding, as in *Britt v. DeJoy*, 45 F.4th 790, 791 (4th Cir. 2022), would make eminent sense.

## Conclusion

The Court should reverse the district court's judgment and remand with directions to grant his motion to suppress and dismiss the remaining charges, which depend on that evidence. In the alternative, the Court should reverse with directions to conduct a new trial.

Respectfully submitted:

/s/ *Steven M. Klepper*
Steven M. Klepper
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
(410) 752-6030
sklepper@kg-law.com

*Appointed Counsel for Appellant*

4865-6355-0577, v. 4

## Statement Respecting Oral Argument

Although the *Buster* opinion is straightforward and sufficient to require reversal, this case raises other important recurring issues on *Terry* stops and jury instructions. A published opinion would be of significant assistance to the bench and bar.

This case was Judge Grimm's final jury trial before he left for the Bolch Judicial Institute to teach jurisprudence to sitting judges. Drawing from his 24 years on the bench, Judge Grimm was clear that the Court's disfavor for defining reasonable doubt was bad for juries, and he invited reversal on this point.

There would be few better tributes to Judge Grimm than to grant his request for reversal on the jury-instruction issue in a published opinion. On the *Terry* issues, this case is a valuable reminder that even the best judges make mistakes of law, and that published opinions like *Buster* are of great help to avoid similar errors on recurring issues.

/s/ *Steven M. Klepper*
Steven M. Klepper

27

**Certificate of Compliance**

I hereby certify that this brief complies with: (1) the 13,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B), in that it contains 5,162 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and (2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Steven M. Klepper*
Steven M. Klepper

28

## Certificate of Service

I hereby certify that, on August 4, 2023, I filed this brief with the Court's CM/ECF system, which will cause copies to be served on all counsel of record.

/s/ *Steven M. Klepper*
Steven M. Klepper
